# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# VALDOSTA DIVISION

MILLARD SHAW,

    Plaintiff,

v.                              Civil Action No. 7:05-CV-82(HL)

ASB GREENWORLD, INC.,

    Defendant.

## ORDER

Before the Court are Defendant's Motion for Summary Judgment (Doc. 21) and Defendant's Motion to Strike (Doc. 31). For the reasons set forth below, Defendant's Motion for Summary Judgment is granted, and Defendant's Motion to Strike is dismissed.

## I. FACTUAL FINDINGS

Viewing the evidence in the light most favorable to Plaintiff, as the nonmoving party, the court finds as follows. In 1994, Plaintiff Millard Shaw ("Shaw") began working as a general laborer with Defendant ASB Greenworld, Inc. ("ASB") at its Valdosta, Georgia plant. (Shaw Dep. 11, June 15, 2006.) Over the next few years Shaw was promoted to various positions within the company under the direction of Plant Manager Cary Scarborough ("Scarborough") and Production Supervisor Chad Cowart ("Cowart"). (Shaw Dep. 13, 15.) Shaw was eventually promoted to Production Supervisor on January 12, 2001, when Cowart left the company. (Shaw Dep. 20.)

As Production Supervisor, Shaw was given a production sheet each week, which planned out the different products to be manufactured for the upcoming week or month. (Shaw Dep. 23.) Shaw was responsible for scheduling laborers and keeping the machines in the facility in working order so the orders on the production sheet could be timely filled. (Shaw Dep. 22, 24, 25.) Shaw was not responsible for tracking the amount of labor used or needed nor responsible for tracking overall productivity. (Scarborough Dep. 21, May 16, 2006; Shaw Dep. 44.) Furthermore, Shaw was never shown a "rolling 12 report" that charted productivity variations in the Valdosta and Virginia plants nor asked to bring Valdosta plant production in line with Virginia plant production. (Shaw Dep. 43, 44.)

In 1998, Kim Eger ("Eger") began working at the Valdosta plant as the Vice President of Sales. (Eger Aff. ¶ 4.) Although Eger was not responsible for decisions in the production area, Eger interfered with the production schedule on several occasions. (Scarborough Dep. 9, 26.) Generally, to complete the production schedule in a timely manner, one product was made until the order was complete since changing the type of product mid-production is not an efficient method of filling orders. (Scarborough Dep. 26.) Shaw was specifically told not to change products mid-production without Plant Manager Scarborough's permission. (Scarborough Dep. 18.)

On several occasions, Eger sought to change the product being made before the order was filled. (Scarborough Dep. 26) Shaw questioned Eger's authority to authorize a change in product, and arguments regularly ensued. (Shaw Dep. 38.) Scarborough left

the Valdosta plant in June 2002. (Eger Aff. ¶ 10.) Until a new plant manager was hired, Shaw worked closely with Eger. (Shaw Dep. 33.) Shaw performed most tasks as instructed by Eger, despite the fact Shaw found Eger's methods inefficient. (Shaw Dep. 34, 40.) The evidence also shows that on occasion Shaw did not follow Eger's instructions. (Eger Aff. ¶ 7.)

Jesse Roberts ("Roberts") was hired as the new Plant Manager on September 18, 2002. (Eger Aff. ¶ 14.) Shaw also had problems complying with Roberts's orders. (Roberts Aff. ¶ 7.) On several occasions, Shaw refused to change the production run and told Roberts, " that's not the way we do it." (Roberts Aff. ¶ 8.) After one exchange, Roberts told Mechanic Dale Bolesta ("Bolesta") that "if [Shaw] won't do what I tell him, I'm going to have to fire the cantankerous bastard." (Roberts Aff. ¶ 8.) In their affidavits, both Roberts and Bolesta maintain the comment was made out of frustration and was not in reference to Shaw's age. (Roberts Aff. ¶ 8; Bolesta Aff. ¶ 9.) After this incident, tension developed between Shaw and Roberts. (Shaw Dep. 69.)

In 2003, Mark West ("West") was hired to assess and increase the plant's production. (West Aff. ¶ 3.) West found the Valdosta plant's production was low. (West Aff. ¶ 5.) West found Shaw extremely knowledgeable about plant operations, but noted that Show was uncooperative and did not get along well with the management. (West Aff. ¶ 6.) In his assessment of the Valdosta plant, West attributed the plant's lagging production in part to Shaw's "poor management skills and his insubordination." (West

Aff. ¶ 7.) After consulting with Roberts, West recommended Shaw's termination to Eger. (West Aff. ¶ 8.) West stated that his recommendation was not influenced by Shaw's age. (West Aff. ¶ 9.)

Shaw was ultimately terminated on August 4, 2003. (Roberts Aff. ¶ 13.) In his affidavit, Roberts stated he told Shaw he would be eligible to continue his insurance coverage. (Roberts Aff. ¶13). Roberts then gave Shaw a termination letter, which also stated an insurance policy was available. (Roberts Aff. ¶ 13.) Shaw refused to sign the letter and now alleges he did not receive the insurance policy until six months later. (Shaw Dep. 52.) Shaw's position was ultimately filled by David Toliver, a 51-year-old white male load operator, and productivity has increased steadily. (Roberts Aff. ¶ 15; West Aff. ¶ 12.) Shaw subsequently filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging unlawful termination. (Complaint ¶ 13.) As part of the EEOC's investigation both Scarborough and Cowart submitted signed letters recounting Eger's treatment of Shaw. (Pl.'s Br. in Opp'n to Def.'s Mot. Summ. J. Ex. B, C.) Cowart's letter includes the following statement: "[m]ore than once, [Eger] mentioned to myself and other coworkers of the need to 'get rid of the old man' and hire someone new." (Pl.'s Br. in Opp'n to Def.'s Mot. Summ. J. Ex. C.) Scarborough's letter includes the following statement: "[w]hen Kim Eger started with ASB as Vice President he took an automatic disliking of Phil and asked me on more than one occasion why didn't I get rid of that old man and get someone younger." (Pl.'s Br. in Opp'n to Def.'s Mot. Summ.

J. Ex. B.) Although Scarborough does not dispute the authenticity of the letter, he stated in his deposition that he could not recall the specific statement made by Eger. (Scarborough Dep. 39,41.)

After the EEOC issued Shaw a right to sue letter, Shaw filed the instant suit against ABS. (Complaint ¶ 14.) Shaw asserts separate claims under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Acts of 1991 ("Title VII"), 42 U.S.C.A. §§ 2000e to 2000e-17 (West 2003), and the Age Discrimination In Employment Act of 1967, as amended by the Age Discrimination in Employment Amendments of 1996 ("ADEA"), 29 U.S.C.A. §§ 621 - 634 (West 2003), for unlawful termination based on age. Shaw also asserts a claim for statutory penalties for a violation of the notice provisions of the Employment Retirement Income Security Act of 1974, as amended by the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), 29 U.S.C.A. §§ 1001 - 1461 (West 2003), and state law claims for intentional infliction of emotional distress and damage to reputation.

## II. ANALYSIS

### A. Motion to Strike

"[A] motion to strike is only appropriately addressed toward matters contained in the pleadings, Fed. R.Civ. P. 12(f), and affidavits submitted in support of a motion are clearly not within that category." Smith v. Southeastern Stages, Inc., 479 F. Supp. 593, 594 (N.D. Ga. 1977). See also Newsome v. Webster, 843 F. Supp. 1460 (S.D. Ga. 1994)

(finding motion to strike to be inappropriate procedure for challenging the content of affidavits); Morgan v. Sears, Roebuck & Co., 700 F. Supp. 1574, (N.D. Ga.1988) (noting United States District Court for the Northern District of Georgia does not entertain motions to strike affidavits). "Rather than filing a motion to strike under Rule 12, the proper method for challenging the admissibility of evidence in an affidavit is to file a notice of objection to the challenged testimony." Morgan, 700 F. Supp. at 1576.

In view of the foregoing, Defendant's Motion to Strike is dismissed. Yet, Defendant correctly asserts that the Court may only consider admissible evidence when deciding a motion for summary judgment. Therefore, the Court will consider Defendant's challenges as objections and assess the admissibility of the various challenged exhibits as part of its consideration of the pending Summary Judgment Motion in the case.

**B. Motion for Summary Judgment**

Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facts and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the Court must evaluate all evidence and any logical inferences in a light most favorable to the non-moving party. Beckwith v. City of

Daytona Beach Shores, 58 F.3d 1554, 1560 (11th Cir. 1995).

"[T]he plain language of Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment, after adequate time and discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The movant carries the initial burden and must meet this burden "by 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the non-moving party's case." Id. at 325. "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The non-moving party is then required "to go beyond the pleadings" and to present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324. The non-moving party must put forth more than a "mere 'scintilla' of evidence;" "there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990). This evidence must consist of more than mere conclusory allegations. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Thus, under Rule 56 summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at

trial." Celotex, 477 U.S. at 322.

**C. Title VII Claim**

Title VII makes it an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A.§ 2000e-2(a)(1) (West 2003). According to the Complaint, Shaw's Title VII claim is based solely on alleged acts of age discrimination. As Title VII does not prohibit discrimination on the basis of age, Shaw's claim, insomuch as it is based on a violation of Title VII, is dismissed.

**D. ADEA Claim**

The ADEA makes it unlawful to use age as a relevant factor in employment decisions. 29 U.S.C.A. § 623(a)(1) (West 2003). In order to recover damages under the ADEA, a plaintiff must first establish a prima facie case. A plaintiff may establish a prima facie discrimination claim through either direct or circumstantial evidence. Damon v. Fleming Supermarkets, Inc., 196 F.3d 1354, 1358 (11th Cir. 1999). As Shaw relies on both direct evidence and circumstantial evidence, the Court will address each in turn.

**1. Direct Evidence**

Direct evidence of discrimination is evidence, that, "if believed, proves [the] existence of [a] fact in issue without inference or presumption." Burrell v. Bd. of Trs. of Ga. Military Coll., 125 F.3d 1390, 1393 (11th Cir. 1997) (citations omitted). Direct

evidence is composed of "only the most blatant remarks, whose intent could be nothing other than to discriminate" on the basis of some impermissible factor. Carter v. City of Miami, 870 F.2d 578, 582 (11th Cir. 1989). However, "[e]vidence that only suggests discrimination, or that is subject to more than one interpretation, does not constitute direct evidence." Merritt v. Dillard Paper Co., 120 F.3d 1181, 1189 (11th Cir. 1997) (quoting Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 n.6 (11th Cir. 1987)). An example of direct evidence would be "a management memorandum saying, 'fire [the plaintiff]–he is too old.' Earley v. Champion Int'l Corp., 907 F.2d 1077, 1082 (11th Cir 1990). Furthermore, statements must "directly relate in time and subject to the adverse employment action at issue." Scott v. Suncoast Beverage Sales Ltd., 295 F.3d 1223, 1227 (11th Cir. 2002).

Here, Shaw contends various statements made by Eger constitute direct evidence of discrimination based on age. Specifically, Shaw points to the following remarks: (1) Roberts told Dale Bolesta that "if [Shaw] won't do what I tell him, I'm going to have to fire the cantankerous bastard;" (2) Eger asked Scarborough why he didn't get rid of that old man and get someone younger; and (3) Eger told Cowart of the need to "get rid of the old man." Although Roberts' and Egers' statements provide circumstantial evidence of discriminatory intent, these statements are not direct evidence as the comments still require the Court to infer that the decision to terminate Shaw was motivated by Shaw's age. A comment must clearly indicate that someone is being fired because he or she is old to constitute direct evidence of age discrimination. Accordingly, there exists no direct

evidence of age discrimination in this case.

## 2. Circumstantial Evidence

In the absence of direct evidence, a plaintiff must establish a prima facie case of age discrimination through circumstantial evidence. To make out a prima facie case for an ADEA violation, a plaintiff must show that he (1) was a member of the protected group of persons between the ages of forty and seventy, (2) was subject to adverse employment action, (3) was replaced with a person outside the protected group, and (4) was qualified to do the job. Jameson v. Arrow Co., 75 F.3d 1528, 1531 (11th Cir. 1996). Furthermore, "[s]ummary judgment against the plaintiff is appropriate if he fails to satisfy any one of the elements of a prima facie case." Turlington v. Atlanta Gas Light Co., 135 F.3d. 1428, 1433 (11th Cir. 1998).

Here, Shaw's position was filled by David Toliver, a 51-year-old white male who was employed as a loader operator at the plant. Thus, Shaw's replacement was not outside the age group protected by the ADEA, and Shaw is unable to establish a prima facie case of age discrimination. Defendant's Motion for Summary Judgment with respect to Shaw's ADEA claim is therefore granted.

Shaw admitts that David Toliver is within the protected class, but nevertheless argues, with no cited legal authority, that he was replaced by an individual outside the protected class because Mark West preformed Shaw's duties as production supervisor when he was hired as Vice President of Production. According to Shaw, the position of

Vice President of Production was a position created after his termination, and was not filled by a person in his age class until ASB was notified of a pending EEOC investigation. Despite Shaw's self-serving conclusiory allegations, there is no evidence before the Court regarding Mark West's job duties immediately following Shaw's termination. Therefore even if Shaw was able to support his argument with legal authority, Shaw's claim would still fail. There is simply no evidence from which the Court would be able to determine whether or not Mark West functioned as a temporary production supervisor between the time Shaw was terminated and David Toliver was promoted.

**E. COBRA Claim**

COBRA requires any employer who sponsors a group health plan to notify qualified beneficiaries of the option to continue coverage under the plan when the beneficiary might otherwise lose coverage under qualifying events such as termination of employment. 29 U.S.C. A. § 1166 (West 2003). Although there is no specified federal statute of limitations for lawsuits to recover benefits under COBRA, "the settled practice is for the court to borrow the forum state's limitations period for the most analogous state law cause of actions when 'it is not inconstant with federal law or policy to do so.'" Harrison v. Digital Health Plan, 183 F.3d 1235, 1238 (11th Cir. 1999) (quoting Wilson v. Garcia, 471 U.S. 261, 266-267 (1985)). In Georgia, a plaintiff's penalty claim, under COBRA, for improper notice is subject to a one year statute of limitations. Id. at 1235 n.1.

Here, Shaw alleges he was not given proper notification within 14 days of his

termination. Therefore, Shaw's cause of action, at the latest, would have accrued on August 17, 2003. Yet, Shaw's complaint was filed on July 21, 2005 – almost two years after Shaw's termination. Therefore, Shaw's claim for statutory penalties under COBRA is barred by the statute of limitations, and Defendant's Motion for Summary Judgment with respect to Shaw's claim for statutory penalties under COBRA is granted.

**F. Intentional Infliction of Emotional Distress Claim**

Georgia courts have established a four-prong test to establish intentional infliction of emotional distress. To sustain a claim for intentional infliction of emotional distress, the following elements must be proved: "(1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress has been severe." Everett v. Goodloe, 268 Ga. App 536, 545 (2004). Further, "liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. Accordingly, "there is no occasion for the law to intervene where someone's feelings are hurt." Kornegay v. Mundy, 190 Ga. App. 433, 434-435 (1989); Biven Software Inc. v. Newman, 222 Ga. App. 112, 114 (1996) (holding that comments were not outrageous where an employer spoke in a rude, condescending, belittling and critical manner).

Here, Shaw has provided no evidence of outrageous conduct on which an

intentional infliction of emotional distress claim could be based. Shaw describes the conduct at issue as "just plain aggravation, being cursed, and making your job difficult when it wasn't." (Shaw Dep. 78.) Shaw further stated the conduct directed at him "kind of hurts your feelings," and when asked if the conduct caused anything more, Shaw stated, "it was just unpleasant." (Shaw Dep. 79.) These comments are not examples of the type of extreme behavior that would provoke the average citizen's resentment against the actor. Further, Shaw's reaction to the conduct was not severe. Georgia courts have consistently held that reactions identical to Shaw's "hurt feelings" do not warrant legal intervention. Therefore, Defendant's Motion for Summary Judgment, with respect Shaw's intentional infliction of emotional distress claim, is granted

**G. Damage to Reputation Claim**

Although Shaw does not identify the cause of action through which he is attempting to recover for damages to his reputation, the Court need not determine the correct procedural vehicle. According to Shaw's deposition, he no longer contends ASB was responsible for any statements that may have damaged his reputation or that his reputation has been damaged in any way. (Shaw Dep. 78.) Therefore, regardless of Shaw's original legal theory, Shaw's damage to reputation claim cannot survive summary judgment without evidence of his damaged reputation. As Shaw contends his reputation was not damaged, Defendant's Motion for Summary Judgment, with respect to Shaw's claim for damage to reputation, is also granted.

## III. CONCLUSION

For the reasons set forth herein, Defendant's Motion for Summary Judgment (Doc. 21) is granted, and Defendant's Motion to Strike (Doc. 31) is dismissed.

**SO ORDERED**, this the 9th day of July, 2007.

<u>**/s/ Hugh Lawson**</u>
**HUGH LAWSON, Judge**

cmr/scs